319 So.2d 464 (1975)
Edward J. CHAROULEAU
v.
CHARITY HOSPITAL OF LOUISIANA AT NEW ORLEANS et al.
No. 6895.
Court of Appeal of Louisiana, Fourth Circuit.
September 15, 1975.
Rehearing Denied October 9, 1975.
Writ Refused November 25, 1975.
*465 Levy & Smith, Adolph J. Levy, New Orleans, for plaintiff-appellant.
H. M. Westholz, Jr., New Orleans, for defendants-appellees.
Before GULOTTA, STOULIG, and MORIAL, JJ.
MORIAL, Judge.
Plaintiff appeals the dismissal of his action for damages arising out of the suicidal death of his wife in the Charity Hospital of Louisiana at New Orleans (Hospital).
On April 5, 1966 at approximately 9:15 P.M., Mrs. Florence Charouleau arrived at the Hospital emergency room seeking treatment. She was seen by a staff physician (Dr. Youngblood) who requested that she be seen by a psychiatric resident, Dr. William G. Walters, because of the nature of the problem she described. Dr. Walters subsequently interviewed and examined Mrs. Charouleau on the first floor in the emergency room. During the course of this examination Mrs. Charouleau pulled a pistol from her purse and pointed it at Dr. Walters. He grabbed the gun from her and found it to be unloaded. He made no effort to ascertain if Mrs. Charouleau had any bullets for the gun. Thereafter "to establish a rapport" between them he returned the unloaded gun and continued with the interview. He learned from Mrs. Charouleau that she wanted to be admitted in order to break a drug habit (Doridin, a soporific sleeping tablet) and, had on occasion been seen by Dr. DiGiacomo, a doctor in the clinical services of the Hospital. She further stated that she had taken an overdose of Doridin on several previous occasions and this was one of the reasons why she sought help. Dr. Walters did not review the chart of Mrs. Charouleau which could have been obtained from the Hospital's record room. It was not the usual procedure, in the absence of compelling circumstances, to review such charts upon routinely seeing a patient in the emergency room. Dr. Walters assured Mrs. Charouleau that she would not be committed to an institution against her wishes. He then proceeded to write an explanatory note to the treating physician in full view of Mrs. Charouleau. The note read: "This lady I feel, would benefit from prolonged hospitalization such as commitment to Mandeville." He then escorted Mrs. Charouleau to the admission desk and instructed her to sit nearby and wait a few moments for the clerk. He placed the emergency room record, including the written remarks, on the admissions desk in front of Mrs. Charouleau for the clerk's attention. He left the patient and thereafter called her husband and informed him that she had the gun at Charity Hospital and that their car was parked on Tulane Avenue.
The admission procedures of Charity Hospital, at that time, were the same for psychiatric and general patients. All patients, except those considered dangerous, were to go to the admission desk and fill out admission forms with the aid of an admission clerk. The clerk was then to call an aide to take the patient to the appropriate *466 ward. Mrs. Charoleau never completed the admission procedures.
Mrs. Charouleau was found the following morning in one of the Hospital's restrooms, dead, from a self-inflicted bullet wound from the pistol which Dr. Walters returned to her during the course of the examination. It was determined that Mrs. Charouleau had left the admission desk sometime after Dr. Walters had left her there, taking with her the admission note written by Dr. Walters. Until this time Mrs. Charouleau had not been admitted to Charity Hospital and according to hospital procedure was actually free to go. Dr. Walters had instructed no one to watch her or dissuade her from leaving should she attempt to do so.
Plaintiff sued Dr. Walters, his insurer and Charity Hospital. Plaintiff settled his claim against Dr. Walters for $5,000, reserving his right to proceed against the Hospital, Dr. Walters' employer. The district court rendered judgment in favor of defendant. We affirm.
As the employer of the physician whose negligent treatment causes injury to a patient, a hospital can be held vicariously liable to a plaintiff under the doctrine of respondeat superior. LSA-R.C.C. Articles 2317, 2320; Wells v. Woman's Hospital Foundation, 286 So.2d 439, 444 (La.App. 1 Cir. 1974). In the present case, however, the fact that the plaintiff released and compromised his claim with Dr. Walters is fatal to a cause of action based upon vicarious liability. This principle is set forth in Williams v. Marionneaux, 124 So.2d 919, 923 (1960), wherein the Supreme Court stated:
"This release, in our view, not only operated to discharge Blanchard [employee] as the party primarily responsible; it effected a complete release of Marionneaux, [employer] who was only secondarily liable. And this, despite the attempted reservation by plaintiff in the release of all of his rights against Marionneaux and his liability insurer.
"There was but one cause of action which the law gave plaintiff in recompense for his injuries. That cause of action sounded exclusively in tort under article 2315 of the Civil Code. Under Article 2320 this same cause of action for Blanchard's alleged tort was assertable against Marionneaux but it was cognizable only because Blanchard was allegedly acting in his function as an employee of Marionneaux at the time Blanchard committed the negligencet [sic] act causing plaintiff's injury. Now, when Blanchard compromised with plaintiff, he repaired his wrong and, therefore, was fully acquitted from further liability. This acquittance inured to the benefit of Marionneaux for the release of the tortfeasor must be held to release Marionneaux also from further responsibility, as his liability for the tortious act was vicarious in nature and derived solely from his legal relation to the wrongdoer."
Accordingly, the hospital can now be held liable only if it can be shown to be independently negligent. In order to demonstrate such, plaintiff contends the Hospital was negligent because 1) it placed a psychiatric resident instead of a psychiatrist in charge of emergency admission of psychiatric patients; 2) it did not have a procedure for direct admission to a psychiatric care unit; 3) it allowed psychiatric patients to wander about the hospital at will before admission; 4) it did not prevent psychiatric patients from seeing their charts; and 5) it did not have a standard admission policy of reviewing the charts of psychiatric patients who were potentially suicidal. The Hospital contends it breached no legal duty which could amount to the proximate cause of the suicide.
Plaintiff attempted to show that the procedural standards of the Hospital were below those generally prevailing in the community.
*467 He based a considerable portion of his argument on the proposition that the Hospital's procedures did not satisfy the requirements of the State of Louisiana's publication entitled, "Rules, Regulations and Minimum Standards Governing Hospitals and The Hospital Licensing Law." LSA-R.S. 40:2109A specifies that those rules "shall have the effect of law, governing the operation and maintenance of hospitals." Plaintiff considers in essence two sections of this publication to be pertinent to the present situation and indicative of the hospital's negligence:
1. "The hospital shall establish safety policies and procedures for the care of patients who because of their condition are not responsible for their acts." § 26.
2. "The layout, design of details, equipment and furnishings of a psychiatric unit shall be such that patients may be under close observation and will not be afforded opportunities for hiding, escape or injury to self or others." § 70.
The trial judge found that Charity Hospital was not bound by these standards. This ruling is correct.
The Hospital was at the time of Mrs. Charouleau's death under the exclusive management, administration and control of its Board of Administrators pursuand to LSA-R.S. 46:753 et seq.[1] Therefore, rules and regulations adopted by authority of the State Hospital Licensing Council (LSA-R.S. 40:2109) cannot guide the Hospital's functions.
Conceding arguendo that the Hospital is governed by the "minimum standards," we conclude that Section 70 is inapplicable because the Hospital is not a "psychiatric unit" but a general hospital. With respect to Section 26, the Hospital did establish adequate safety precautions to care for those patients who "because of their condition were not responsible for their acts." Dr. John Salatich, Director of the Hospital's Emergency Room, testified that if a doctor desired a patient to remain under constant supervision, he could write this on the emergency room sheet and a nurse would carry out the order and remain with the patient. Apparently, Dr. Walters believed his patient did not require such treatment. He testified that she acted calmly. Surely no one on the emergency room staff could have concluded from outward appearances that the patient was contemplating suicide. It was the responsibility of the treating physician to notify the staff of her condition. He chose not to do so. Obviously his medical judgment was wrong; but the fact remains that adequately established precautionary procedures were available.
Under the circumstances of this case, where there was an absence of an outward manifestation of an emergency situation, the procedures employed by the Hospital were not negligent. Addressing himself to this issue, the learned district judge aptly stated:
". . . The Court is unable to find any negligence, per se, which was committed by the hospital and which could have been the proximate cause of the decedent's suicide.
"When a patient voluntarily presents herself (or himself) for admission for treatment, the consulting resident has no way of determining whether or not the appearing patient had been previously treated by the hospital. Hence, until the patient is actually admittedor, unless so told by the patient,the previous hospital *468 records of the patient, if any, are not called for (at least, under the admittance practice of the hospital in April of 1966). To proceed otherwise would obviously create a considerably more extended delay that was then, or is now, experienced by patients seeking admission for any form of treatment. And, except in a case where it is evident that a patient may be obviously dangerous to himself (or herself), or to others, the hospital would have no right to detain or restrain that patient prior to actual `admittance.'
"The evidence, in the Court's opinion, fails to establish any evidence which would indicate that the hospital's methods of admittance procedure was other than that which is generally used by public hospitals of a character and size similar to that of Charity Hospital of Louisiana, or that such procedureeven if below any such standards set by the Communitywas the proximate cause of decedent's death."
We find nothing in the record to cause us to disagree with these conclusions. See 60 ALR3d 880.
Plaintiff proffered the testimony of a non-local expert hospital administrator, Dr. Murray Diamond, in an attempt to establish that Charity's admission procedures were clearly below community standards. The "locality rule" places upon a hospital the duty to exercise the degree of care, skill and diligence used by hospitals generally in that community. Lauro v. Travelers Insurance Company, 261 So.2d 261 (La.App. 4 Cir. 1972). In April of 1966 (the date of the suicide) Dr. Diamond did not reside in New Orleans nor was he practicing medicine in this area. Dr. Diamond was incompetent to testify as to local community hospital standards at the time of Mrs. Charouleau's death. The trial judge's refusal to admit his testimony was correct. Accordingly, we find no abuse of the trial court's wide discretion to determine if a witness is qualified to give expert testimony. Bonilla v. Arrow Food Distributors, Inc., 202 So.2d 438 (La.App. 4 Cir. 1967).
For the foregoing reasons, the judgment is affirmed.
Affirmed.
NOTES
[1] Subsequently, Acts 1972, No. 253 transferred the powers and duties of the Board of Administrators of Charity Hospital of Louisiana at New Orleans to the Louisiana Health Social and Rehabilitation Services Administration. LSA-R.S. 46:1751, 46:1767. By virtue of this transfer the Charity Hospital of Louisiana at New Orleans is now regulated by rules and regulations promulgated pursuant to LSA-R.S. 40:2108, et seq.