477 So.2d 1094 (1985)
Henry A. SIBLEY, III Curator of Jane Elizabeth Sibley, Interdict
v.
The BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY and Agricultural and Mechanical College.
No. 84-C-0571.
Supreme Court of Louisiana.
September 18, 1985.
Dissenting Opinion September 20 and 27, 1985.
Rehearing Denied October 17, 1985.
*1097 David W. Robinson, Due, Dodson, deGravelles, Robinson & Caskey, Steve Marks, Marks & Lear, Baton Rouge, for plaintiff applicant.
Vincent P. Fornias, Kantrow, Spaht, Weaver & Blitzer, Baton Rouge, for defendants-respondents.
Robert J. Conrad, Jr., New Orleans, for Louisiana Medical Mut. Ins. Co.
Franklin D. Beahm, New Orleans, for Jefferson Soc. of Obstetricians and Gynecologists.
H. Lee Leonard, Keitha A. Leonard, Lafayette, for Lafayette Parish Medical Soc.
Philip A. LeTard, Vidalia, for Louisiana Soc. of Anethesiologists.
Gordon L. James, Monroe, for Ouachita and Calcasieu Parish Medical Societies.
Howard B. Gist, Jr., Alexandria, for Rapides Parish Medical Soc.
Donald T.W. Phelps, Baton Rouge, for Louisiana Academy of Family Physicians, Louisiana Psychiatric Ass'n and Lafourche Parish Medical Soc.
Henry B. Alsobrook, Jr., Patricia M. Hill, New Orleans, for Louisiana Section of the American College of Obstetricians and Gynecologists and the New Orleans Gynecological and Obstetrical Soc.
V. Elaine Boyle, Athena B. Piedrahita, Baton Rouge, for State of Louisiana.
Robert L. Roland, Peter T. Dazzio, Debra A. Templet, Baton Rouge, for Ass'n Ins. Trust Fund.
Ricardo M. Guevara, Baton Rouge, for Louisiana Hosp. Assn.
Roger M. Fritchie, Baton Rouge, for East Baton Rouge Medical Soc.
Sidney E. Cook, Shreveport, for Shreveport Medical Soc. and Bossier Parish Medical Soc.
Harvey J. Lewis, Russ Herman, New Orleans, for Louisiana Trial Lawyers in support of the application for rehearing on behalf of plaintiff-applicant.
D. Douglas Howard, Jr., Shawn Craddock Pedersen, Leslie A. Bonin, New Orleans, for Estate of Marlene Roubion.
Joseph W. Thomas, Ammon L. Miller, Jr., New Orleans, for Prince Williams.
Dermot S. McGlinchey, Paul M. Batiza, Eve Barrie Masinter, New Orleans, for Orleans Parish Medical Soc.
R. Gordon Kean, Jr., Pamela C. Walker, Baton Rouge, for Louisiana State Medical Soc.
Stewart E. Niles, Jr., New Orleans, Jefferson Parish Medical Soc. and Tulane Educational Fund.

[ON REHEARING]
DENNIS, Justice.
We granted rehearing to consider plaintiff's arguments that: (1) the statutory prohibition of a medical malpractice judgment exceeding 500,000 dollars does not apply to a state hospital governing board's independent liability for its own negligence, as opposed to its vicarious liability for the medical malpractice of its health care employees; (2) Jane Sibley's injuries were caused by the LSU Board's independent *1098 negligence in authorizing psychiatric treatment at LSU Medical Center by teams rather than by individual physicians, by delegating important responsibilities to medical students and inexperienced doctors, by establishing inadequate procedures for supervision and review of patient care, and by other similar acts and omissions; (3) alternatively, the malpractice judgment limitation is invalid because it conflicts with the constitutional guarantee of equal protection and the constitutional prohibition against state immunity from suit and liability for personal injury; (4) therefore, this Court should either award the full amount of Sibley's damages, or remand the case to the court of appeal to determine those damages.
We also take judicial notice of Act No. 239 of the 1985 regular session of the Legislature, which retroactively repealed the statutory limitation on liability insofar as it applied to the recovery of medical expenses.

1. Background Pertinent to Rehearing
Jane Sibley, age 19, suffered permanent, devastating mental and physical injuries in 1980 while she was a psychiatric patient at the LSU Medical Center in Shreveport, a hospital under the supervision and management of the LSU Board. The LSU Medical Center is a teaching hospital staffed primarily by physicians who teach at LSU Medical School. At the time of Sibley's injuries, the hospital employed a team system to treat psychiatric patients and train interns and residents. Each team consisted of a staff psychiatrist as its leader, along with residents, interns, nurses, social workers, and psychologists. Most of a team's health care was provided by its less experienced residents, interns and auxiliary personnel, under the supervision and review of the staff psychiatrist and senior residents. A team's diagnosis and treatment of an individual patient was not subject to review by any independent committee.
Because of lack of funds, Sibley transferred to LSU Medical Center from a private psychiatric hospital where she had been treated conservatively for depression. Her LSU Medical Center team's staff psychiatrist changed her diagnosis from depression to psychosis. Members of the team administered anti-psychotic drugs to her in increasing dosages and combinations over a period of weeks. On or about September 15, 1980, Sibley developed an anticholinergic reaction which culminated in cardio-pulmonary arrest and massive brain damage. It was proven that the team's acts of malpractice caused Sibley's mental and physical debilitation which consign her to a lifetime of institutional care, that her medical expenses exceeded $423,000 at the time of trial in January 1983, and that her total damages obviously exceed the $500,000 statutory limit by a yet undetermined amount. Because they concluded that the statutory limitation is valid and applicable, the previous courts and this Court, 462 So.2d 149, in its original opinion considered that an award limited to $500,000 was required by law.
Plaintiff argues that the evidence shows that the LSU Board was negligent in permitting psychiatric treatment and administration of drugs by teams without independent patient care review, that the Board's administrative failure caused Sibley's injury, that the Board's liability for its own negligence is independent and separate from its vicarious liability for the delicts of its agents and servants, and that, even if the Board may indirectly benefit from the statute insofar as its vicarious liability is concerned, its independent liability is unaffected because the statute is not designed to protect the state or the Board, but was instead intended to afford protection to individual health care providers acting for the state by placing a ceiling on their liability and providing for the payment of judgments against them. In the event plaintiff is not entitled to judgment against the Board based on its independent negligence, he points out that we did not address all of his arguments on original hearing that the statutory limit is unconstitutional, and asks for relief on these grounds. Before we reach these questions, however, we should deal with a change in the scope of the *1099 statutory limit on liability made during the recent legislative session.

2. Repeal of Limitation on Recovery of Medical Expenses
By Act No. 239 of 1985, the Legislature amended the limitation of liability for the acts of persons who provide health care services on behalf of the state, La.R.S. 40:1299.39, to provide that the limitation shall not apply to "all reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services, including drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services," but not including "nonessential specialty items or devices of convenience." The Act also provides for the creation of a fund for the payment of these expenses, for the effect and means of satisfying a judgment or compromise, including an award of such expenses, and for other related matters. The provisions of the act are expressly made applicable to pending litigation and pending claims. Accordingly, even if plaintiff should fail in his attempts to avoid or invalidate the statutory limitation, plaintiff is at least entitled to an amendment of the judgment awarding medical expenses in accordance with this act.

3. Statutory Construction
Every person who causes damage to another by his fault is obliged to repair the damage. C.C. art. 2315. Every person is responsible, not only for the damage occasioned by his own act, but also for that which is caused by the act of persons for whom he is answerable. C.C. art. 2317. Every person who is a master or employer is answerable for the damage occasioned by his servants and employees in the exercise of the functions in which they are employed. C.C. art. 2320.
In accordance with Civil Code article 2315, our courts have formulated duties of care under the circumstances of individual cases to determine when a hospital's governing body is responsible for its own acts or omissions which cause injury to a patient or other person. See Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974). For example, the governing board of a hospital owes a duty to select its employees with reasonable care, Grant v. Touro Infirmary, 254 La. 204, 223 So.2d 148 (1969), a duty to furnish the hospital with reasonably adequate supplies, equipment, appliances and facilities for use in the diagnosis and treatment of patients, Snipes v. So. Baptist Hospital, 243 So.2d 298 (La.App. 4th Cir.1971); Lauro v. Travelers Ins. Co., 261 So.2d 261 (La.App. 4th Cir.1972); Hernandez v. Smith, 552 F.2d 142 (5th Cir.1977); and a duty to provide adequate procedures for the maintenance of safety and sanitation in its grounds and buildings, Head v. St. Paul Fire & Marine Ins. Co., 408 So.2d 1174 (La.App. 3d Cir.1982); Roark v. St. Paul Fire & Marine Ins. Co., 415 So.2d 295 (La.App. 2d Cir.1982). A breach of one of these duties or a similar duty of care which causes injury to a patient or other person may constitute independent negligence by a hospital's governing board, resulting in the hospital's liability even in the absence of any finding of negligent conduct by an employee.
Conversely, a hospital may be answerable for damage caused by its employees' negligence despite the fact that no negligent act or omission of its governing board is proved. Garlington v. Kingsley, 289 So.2d 88 (La.1974); Charouleau v. Charity Hospital of La., 319 So.2d 464 (La.App. 4th Cir.1975); Albritton v. Bossier City Hosp. Com., 271 So.2d 353 (La. App. 2d Cir.1972); Norton v. Argonaut Ins. Co., 144 So.2d 249 (La.App. 1st Cir. 1962); Ulmer v. Baton Rouge General Hospital, 361 So.2d 1238 (La.App. 1st Cir. 1978); Meynier v. DePaul Hospital, 218 So.2d 98 (La.App. 4th Cir.1969); Suhor v. Medina, 421 So.2d 271 (La.App. 4th Cir. 1982); see also Loescher v. Parr, 324 So.2d 441 (La.1975).
These are the fundamental precepts of tort responsibility in Louisiana with which we must start in determining whether the Legislature intended that the statutory limitation on a malpractice judgment *1100 should also limit a state hospital governing board's independent liability for its own acts or omissions. See Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La. 1978). These principles are, of course, equally applicable to the State, a state agency, a political subdivision, and the LSU Board, a constitutionally created body corporate of the state. La. Const. art. 12, § 10(A); La. Const. art. 8, § 7(A); Bd. of Com., Port of N.O. v. Splendour Shipping Ent. Co., Inc., 273 So.2d 19 (La.1973); Darville v. Associated Indemnity Corp., 323 So.2d 441 (La.1975).
According to the general popular use of its words, the statute in question, La.R.S. 40:1299.39, is clear in its objects and meaning. The statute's primary purpose appears to be to insure an adequate supply of physicians and other professionals providing medical and related health care services on behalf of the state (1) by prohibiting judgments in excess of $500,000, exclusive of medical expenses, based on such a person's malpractice, and (2) by providing that the state shall pay the judgments and costs of defense associated with alleged medical malpractice committed by such a person while providing health care services on behalf of the state. Protecting the state and its institutions from other types of judgments is not the object of the legislation. The act clearly does not prohibit or affect judgments based on the negligence of anyone except physicians and other professionals providing medical and related health care services.
That the legislative aim was so limited is clear from the careful definition and connection of terms in the statute. The limitation of liability prohibits a statutorily excessive judgment based on malpractice.[1]Malpractice is defined restrictively as "any unintentional tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient."[2] "`Health care' means any act or treatment performed or furnished or which should have been performed or furnished by any person covered by [the statute] for, to, or on behalf of, a patient during the medical care, treatment or confinement of the patient."[3] "`Person' means any individual acting in a professional capacity in providing health care services, by or on behalf of the state, and shall include but not be limited to a physician, psychologist, dentist, registered nurse, licensed practical nurse, pharmacist, optometrist, podiatrist, physical therapist, laboratory or x-ray technician, clinical social worker, or hospital administrator, acting within the course and scope of his employment, pursuant to a contract with the state, which contract specially names that health care provider, for professional services or to render other health care services, health care facility staff appointment, or assignment for or on behalf of the state, whether he receives compensation or not, without regard to where the services are performed, or performing voluntary professional services in a health care facility or institution for or on behalf of the state; or a resident, intern, or student, of any discipline listed herein who is assigned as a part of his prescribed training when acting within the course and scope of his assigned training or staff appointment, without regard to where the services are performed."[4] A health care provider practicing a recognized specialty is required to exercise the degree of skill ordinarily employed by members of his specialty in good standing; a health care provider who does not specialize is required to exercise the degree of skill ordinarily employed *1101 by the members of his profession licensed to practice in Louisiana who are in good standing in a similar community or locale.[5] The coverage provided by the statute applies "only when the health care provider (`person' as defined herein) is acting within the scope and course of his employment, pursuant to a contract to render health care services," or by appointment, assignment, or voluntary service, regardless of compensation or lack thereof, or as a resident, intern or student within the course of scope of his training or appointment.[6]
In summary, the statute imposes a ceiling of 500,000 dollars on the state's liability for "malpractice," other than liability for medical expenses; provides a procedure for payment of unlimited medical expenses; defines "malpractice" as the torts of "health care providers"; equates "health care providers" with "persons"; defines "person" as an individual acting in a professional capacity to provide health care services; and extends its coverage only where a "health care provider" acts within the scope of his employment, or within his prescribed training if the "health care provider" is a student, resident or intern.
The legislative goal to protect only physicians and other professionals engaged in learning or practicing healing arts or skills is evident from the selection of terms and the obvious alternative choices of words rejected. "Malpractice," "professional," "specialty," "community standard of care," and other terms used to define the protected class commonly refer to natural persons engaged in a learned medical art, the degree of professional skill or learning expected of its members, and derelictions from this standard resulting in injury or death to a patient. If the legislature had intended to protect persons or entities outside this class against unlimited judgments based on grounds other than medical malpractice, it easily could have done so by specifically including within the protected class the State, its institutions, boards, or hospitals, and by prohibiting statutorily excessive judgments against them based on their negligence, strict liability, or other fault. Instead, the statute adheres to the usual meaning of malpractice and the professional class with which it is commonly associated, except that the law restricts its protection and benefit to those physicians and other professional persons who provide medical and related health care services to patients on behalf of the state, rather than in private practice.
The history of antecedent legislation confirms this interpretation. In 1975, the legislature authorized each hospital and agency of the state which employed physicians, dentists, or professional nurses to provide them with medical malpractice insurance at public expense. Acts 1975, Nos. 477, 674. In 1976, Act 66 provided that a person performing health care services for or on behalf of the state would not be obligated to pay damages for his malpractice, but that the state assumed his liability and defense costs. However, Act 660 of 1976 superseded that act by providing that a person providing health care on behalf of the state would not be liable for damages in excess of 500,000 dollars plus interest and costs for any injury or death of a patient due to malpractice, and that any judgment rendered against a health care provider would be paid by the state. By Act 744 of 1977, the legislature provided that the state would not sue a health care provider or his malpractice insurer for reimbursement for damages or defense costs until the judgment in the malpractice action was final. House Concurrent Resolution No. 49 of 1977, however, suspended this provision. In 1978, Act 611 changed the limitation on liability to a prohibition against any judgment in excess of five hundred thousand dollars based on the malpractice of a health care provider and further provided, without mention of reimbursement, that the state would pay damages and defense costs arising from a health care provider's malpractice.
*1102 Throughout this series of acts the legislative aim was to afford or enhance protection for physicians and other persons providing health care to patients on behalf of the state. In these enactments the legislature never displayed an intent to limit liability based on a negligent act or omission which did not constitute medical malpractice by a physician or other natural person who was a health care provider.
The contrast between the statute in question and the private Medical Malpractice Act, R.S. 40:1299.41 et seq., which affords protection to qualified, generally private, hospitals, physicians, and others providing health care, further confirms our interpretation. Under the Medical Malpractice Act the total amount recoverable for malpractice causing injury or death to a patient, exclusive of medical care and related benefits, shall not exceed five hundred thousand dollars plus interest and cost.[7]"`Malpractice' means any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient ...[8]`Health care provider' means a person, corporation, facility or institution licensed by this state to provide health care or professional services as a physician, hospital, dentist, registered or licensed practical nurse, pharmacist, optometrist, podiatrist, chiropractor, physical therapist or psychologist, or an officer, employee or agent thereof acting in the course and scope of his employment."[9]"`Hospital' means any hospital as defined in La.R.S. 40:2102; any `nursing home' or `home' as defined in La.R.S. 40:2009.2; or any physician's or dentist's offices or clinics containing facilities for the examination, diagnosis, treatment or care of human illnesses."[10] "The standard of care required of every health care provider, except a hospital, in rendering professional services or health care to a patient, shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment in the application of his skill."[11]
The private malpractice act gives greater protection than that afforded by the state act with respect both to the class protected and the types of judgments affected. By expanding the definition of health care provider to include corporations, facilities, or institutions providing health care as a hospital, and all officers, employees, or agents thereof, the private malpractice act covers an entire hospital, including its governing board and non-professional employees. By defining health care to include any act or omission performed by any health care provider for, to, or on behalf of a patient, the private malpractice act protects against statutorily excessive judgments based not just on malpractice, but on virtually any breach of duty or contract causing injury or damage. The legislature's strategic use of these specific terms to expand the private malpractice act's scope of protection over that of the contemporaneously adopted state act indicates that the omission of such provisions from the latter piece of legislation was intentional and should not be construed as a tacit invitation for judicial gloss. Reinforcing this conclusion is the observation that the private act excepts hospitals from the application of the community or locality standard of care used to judge the conduct of other health care providers.[12] No such exception to the standard of care is contained in the state malpractice act because it applies only to natural persons who are health care providers, not to hospitals.
On original hearing, we concluded that the prohibition of La.R.S. 40:1299.39 *1103 against a malpractice judgment exceeding 500,000 dollars limited a judgment based on a state hospital board's own negligence, apart from any fault of its physicians or other health care personnel. Our conclusion was based on these reasons: (1) The heading or title preceding the part of the revised statutes containing La.R.S. 40:1299.39 is "Malpractice Liability for State Services"; (2) La.R.S. 40:1299.39(D) provides in part: "All malpractice claims against the state shall be submitted to and administered by the Division of Administration"; (3) Paragraph B of La.R.S. 40:1299.39 prohibits a judgment in excess of 500,000 dollars "for an alleged act of malpractice," without specifying who must have committed the act.
After considering the oral arguments and briefs of counsel and studying the statutes in the context of our basic delictual principles, we conclude that our original opinion was in error in these respects for the reasons stated earlier, and the following reasons as well: (1) R.S. 1:13 provides: "Headings to sections, source notes and cross references are given for the purpose of convenient reference and do not constitute part of the law." A heading may suggest an interpretation when the statutory language is unclear. But in this case it is the heading which is ambiguous and the statute that is clear. On examination of the statute, it becomes clear that the term "state services" in the heading can refer only to the services of individual persons acting in a professional capacity to provide health care to patients on behalf of the state.[13] (2) La.R.S. 40:1299.39(D), providing that all malpractice claims against the state be submitted to the Division of Administration, follows La.R.S. 40:1299.39(C), which provides that "the state shall pay any damages ... in connection with any claim lodged against any health care provider (`person' as defined herein) for an alleged act of medical malpractice ... up to the limits set forth in this Part." In essence, the state in paragraph C assumes responsibility for the payment of malpractice judgments and claims within the stated limits as its own, and merely designates in paragraph D the proper division of the executive department to which such claims against the state under its assumed liability should be submitted for expeditious handling. (3) As we explained above, La.R.S. 40:1299.39(A)-(H) must be construed as a whole because its several sections are interdependent. The prohibition against a statutorily excessive judgment for an alleged act of malpractice, par. B, is necessarily qualified by the definition of malpractice, par. A(5), which is explained with more precision by the definitions of health care, par. A(6), and person, par. A(1). When these provisions are read together it is clear that the statute deals with medical malpractice committed by individual professional persons providing health care on behalf of the state, not with malpractice in general. Statutes in pari materia, or upon the same subject matter, must be construed with reference to one another. C.C. art. 17.
The court of appeal, 446 So.2d 760, adopted a different view of the statute, reasoning that: (1) The statute must be given a liberal interpretation because of its purpose to insure the availability of state medical services at little or no cost; (2) The list of health care personnel covered in the act, which was expanded recently, is merely illustrative since the statute includes "but is not limited to" the health care professionals named.
In our original opinion we found the court of appeal's reasons unconvincing without stating why. Briefly, the reasons are: First, as we endeavored to explain earlier, the primary object of the statute is to attract and keep individual professionals to provide health care to patients on behalf of the state by affording them protection against malpractice judgments, not to reduce the state's financial burden of public health care. Moreover, the distinction of laws into odious laws and laws entitled to favor, with a view of narrowing or extending *1104 their construction, cannot be made by those whose duty it is to interpret them. C.C. art. 20. Second, although we agree that the list of health care personnel covered by the statute is not exclusive, the definition of a "person" covered by the act, viz., "any individual acting in a professional capacity in providing health care services, by or on behalf of the state,"[14] together with the definition of "coverage" and the other provisions of the statute, clearly indicate that the state does not fall within the class of persons covered.
Plaintiff makes clear in his brief on rehearing that he seeks a judgment for all of Sibley's damages against the LSU Board based on its own alleged acts and omissions of administrative negligence. Plaintiff refrains from disputing, without conceding, that the statutory prohibition against a malpractice judgment in excess of 500,000 dollars applies to bar his recovery against the LSU Board over this amount based on its vicarious liability for the medical malpractice of its physicians and other health care personnel. The plaintiff is correct in not disputing the issue. The statute in effect limits the LSU Board's vicarious liability because it prohibits any judgment whatsoever based on the malpractice of physicians or other health care personnel in excess of the statutory limit.
For the reasons assigned, we conclude that, although the statute would apply to bar a judgment for damages in excess of the statutory maximum based on either the malpractice of an individual health care provider or the vicarious liability of the LSU Board as his employer, it does not bar more complete recovery based directly upon the Board's own negligence. Accordingly, since the previous courts pretermitted the issue of the Board's primary or independent liability, and since it appears that there is substantial evidence in the record on this question, we will follow our established procedure in such cases by remanding the case to the court of appeal for its findings of fact and judgment based on the record. Gonzales v. Xerox, 320 So.2d 163 (La.1975).

4. Equal Protection
In our original opinion we upheld the statutory malpractice judgment limitation against an attack based on the guarantee of equal protection. In doing so, we employed the three-level system of scrutiny developed by the United States Supreme Court. Our opinion did not state whether the statutory provision was consistent with our state constitution's declaration of right to individual dignity, as well as being consistent with the Fourteenth Amendment's equal protection clause, or whether this court had elected to use the federal three level system of scrutiny in state constitutional adjudication. We are now called upon to decide these questions.
Upon considering the arguments of the parties, the respective constitutional provisions, our constitutional convention debates, United States Supreme Court decisions, and evaluation and criticism of the three-level system of scrutiny, we conclude that (1) the federal multi-level system is not an appropriate model for interpreting and applying the protection of equal laws pledged by our state constitution; (2) when a law classifying individuals on the basis of physical condition is attacked, the proponent of the legislation must show that the law does not arbitrarily, capriciously, or unreasonably discriminate against the disadvantaged class by demonstrating that the legislative classification substantially furthers a legitimate state objective; (3) the statutory provision prohibiting a malpractice judgment in favor of a severely injured and disabled person in excess of 500,000 dollars classifies individuals based on their physical condition; (4) the LSU Board did not attempt to show that the legislative classification substantially furthered a legitimate state end. However, because this is the first time we have interpreted the constitutional provision with regard to the parties' burdens, in the interest of justice the case will be remanded *1105 to afford the parties an opportunity to introduce evidence on this issue.

A. The Federal Three-Level System Is An Inappropriate Model for Equal Protection Analysis Under the Louisiana Constitution
An important feature of the United States Supreme Court's current equal protection analysis is an elaborate system of judicial review composed of three levels of scrutiny, commonly referred to as strict, intermediate, and minimal scrutiny. This system arose out of the constitutional crisis caused by the Court's clash with the Roosevelt administration and its New Deal legislation. After the collision, the Court's prestige plummeted, and the Court renounced much of its power by adopting a posture of extreme deference to the other branches of government. Governmental actions were presumed to be constitutional, forcing a challenging party to prove the challenged action to be completely unrelated to any legitimate governmental objective. However, to provide adequate protection for express constitutional rights, such as freedom of speech, to protect implicit fundamental rights, such as the right of privacy, or to protect against governmental action based on an invidious suspect classification, such as race or ethnic origin, the Court has retained a more exacting mode of judicial review that requires strict scrutiny of such governmental conduct. Under strict scrutiny, government action is not presumed to be constitutional, and will not be upheld by the Court unless shown to be necessarily related to a compelling state interest. See J. Nowak, R. Rotunda, & J. Young, Handbook on Constitutional Law 524-525 (1978); L. Tribe, American Constitutional Law 1000-02 (1978).
The Warren court brought into focus a "sharp difference" between strict and minimal scrutiny. Scrutiny that was strict in theory turned out to be fatal in practice, while scrutiny that was minimal in theory turned out to be nonexistent in practice. In order to inject some flexibility, the Burger court has formulated yet a third level of judicial review, which operates as an intermediate form of scrutiny. When using intermediate scrutiny, the Court will uphold government conduct if it is substantially related to an important governmental interest. See e.g., Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).
The three-level system has been the target of a growing chorus of criticism. A majority of the justices have indicated various degrees of dissatisfaction with the three-tiered approach in both words and actions. In some difficult cases the Court has simply abandoned the system by deciding equal protection questions without its traditional analysis. See e.g., Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); Rostker v. Goldberg, 453 U.S. 57; 101 S.Ct. 2646; 69 L.Ed.2d 478 (1981); Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758; 65 L.Ed.2d 902 (1980). More subtle departures from the system have occurred when the Court has exercised the degree of scrutiny reserved for a particular level to decide cases logically falling within a different level. In this way the court has on an ad hoc basis carved out exceptions to strict scrutiny,[15] downgraded intermediate scrutiny,[16] upgraded minimal scrutiny,[17] and shifted the burden to the *1106 state of showing a valid governmental interest which is rationally served.[18]
Commentators have diagnosed several underlying causes for the disorder in the three-level system.[19] Its rigidity forces courts to begin the decision-making process by pigeon-holing a case in a particular category. Once assigned a category, the case theoretically must receive the same type of treatment as all other cases of the same level. However, when application of the process threatens to work injustice, judicial ingenuity is used to shunt the case to another tier, where a different level of scrutiny affects its outcome. Consequently, the Court's opinions are preoccupied with the abstractions of "fundamental right," "suspect classification," "levels of scrutiny," and the like, instead of focusing on an open analysis of the specific merits of the individual cases which would necessarily entail a balancing or comparative evaluation of government and individual interests. Internal inconsistency has therefore plagued the system, because the reasons for decisions stated in the Court's opinions are not always reliable guides or predictors for handling ostensibly similar cases. See e.g., Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) in which the Court afforded illegal aliens only middle tier protection rather than the protection of strict scrutiny afforded other aliens; Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) in which the Court applied only middle tier scrutiny to gender based legislation despite the "immutable" characteristics of sex, as opposed to race which receives strict scrutiny.
For example, Professor Shaman observes:

At this point in American constitutional history, it is fair to say that the multilevel system of judicial review has outlived its usefulness. Spawned as a reaction to the political exigencies of the New Deal Court crisis, the multi-tier approach may have had some strategical value at one time, but it never has been able to provide a theoretically sound framework for constitutional adjudication. As a system of judicial review, it always has been and always will be an overly rigid structure that retards constitutional analysis by diverting thought away from the merits of cases and by constricting thought through a priori categories. Continuous tinkering with the multi-level system over the years since its inception has not been able to remedy its fundamental defects, and, in fact, may actually have made matters worse. Even the major revision of adding an intermediate tier of scrutiny has proven to be little more than a stopgap.
* * * * * *

By now it is no exaggeration to say that the multi-level system has reached a point of substantial disarray. As we have seen, deviation from the system has become so common as to render constitutional adjudication a desultory affair. Given the basic flaws of the multi-tier system, it is most improbable that this deviation will abate in the future. Changes in the Court's personnel are unlikely to improve the situation without a corresponding change in the Court's method of decision-making. If constitutional law is ever again to enjoy a fair degree of coherence and stability, it will be necessary to convert the multi-level approach to a unified system of judicial review. (Emphasis added.) Shaman, "Cracks in the Structure: The Coming Breakdown of the Levels of Scrutiny," 45 Ohio State L.J. 161, 182-83 (1984).
*1107 A workable alternative to the multi-level system, according to a respectable group of scholars and jurists, would be a comprehensive system based upon the unitary standard announced in Police Dept. of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), which in all instances would inquire whether there is "an appropriate governmental interest suitably furthered" by the governmental action in question. With the abolition of multiple tiers of scrutiny, constitutional adjudication would gain in flexibility, accuracy, and openness. The constitutionality of governmental action would not depend upon the level of scrutiny applied in a particular case, and the need now felt in a considerable number of cases to manipulate principle and precedent in order to reach a proper result would be eliminated. Judicial attention would be focused on the merits of a case and not diverted toward abstract questions. By removing the blinders imposed by a priori categories, the Court would naturally focus upon governmental and individual interests, resulting in a more precise and reliable evaluation of constitutional questions. See Shaman, footnote 15, supra, at pp. 174-75.
We conclude that the federal jurisprudence should not be used as a model for the interpretation or application of that part of the Louisiana Declaration of Rights dealing with individual dignity which is at issue in this case. The federal three level system is in disarray and has failed to provide a theoretically sound framework for constitutional adjudication. Also, as we will endeavor to demonstrate, the state constitution calls for more than minimal scrutiny of certain types of classifications, and assigns the state the burden of showing that such legislation is not arbitrary, capricious or unreasonable.

B. State Equal Protection and Classification
Article I, Section 3 of the 1974 Louisiana Constitution, the Declaration of Right to Individual Dignity, provides: "No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime."
Article I, Section 3 commands the courts to decline enforcement of a legislative classification of individuals in three different situations: (1) When the law classifies individuals by race or religious beliefs, it shall be repudiated completely;[20] (2) When the statute classifies persons on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliations, its enforcement shall be refused unless the state or other advocate of the classification shows that the classification has a reasonable basis;[21] (3) When the law classifies individuals on any other basis, it shall be rejected whenever a member of a disadvantaged class shows that it does not suitably further any appropriate state *1108 interst.[22] With the adoption of these guarantees Louisiana moved from a position of having no equal protection clause to that of having three provisions going beyond the decisional law construing the Fourteenth Amendment.[23]
The Declaration of Rights committee of the 1973 Constitutional Convention proposed an article raising the threshold of equal protection by prohibiting discrimination because "of birth, race, age, sex, social origin, physical condition, or political or religious ideas." As explained by the committee spokesman, because the federal courts had failed to afford real or substantial protection by applying the Fourteenth Amendment to legislation based on all of these classifications, the proposed article would require judicial examination when any such classification was challenged and would assign to the State the burden of showing that the classification reasonably furthers a legitimate purpose.[24] A person challenging a legislative classification based on any other grounds would have to show that the law was unreasonable or that it did not further any appropriate state interest.[25]
The constitutional convention, in amending the article before its adoption, varied its emphasis but not its fundamental thrust toward greater protection against arbitrary discrimination. First, a major effort to reduce the article's level of protection to that afforded by the Fourteenth Amendment was decisively rejected.[26] Next, legislative classifications because of race and religious beliefs were banned absolutely. Finally, the remaining specific categories of legislative classifications, viz., birth, age, sex, culture, physical condition, political ideas or affiliations, were permitted if the state could show that the classification was not arbitrary, capricious or unreasonable. Except for making race and religious beliefs absolutely forbidden classifications, there was no attempt to change the original concept of the Declaration of Rights Committee under which specific categories of classifications are designated, and the state is assigned the burden of justifying such a classification by showing that it substantially furthers an appropriate state purpose. See generally, Proceedings, Aug. 29, 1973, pp. 1016-18.
The statutory prohibition against a malpractice judgment in excess of 500,000 dollars classifies individuals because of their physical condition. The law on its face is designed to impose different burdens on different classes of persons according to the magnitude of damage to their physical condition. The statute creates two classes: one, a group of malpractice victims each of whom has suffered damage that would oblige a defendant under our basic law to repair it by paying in excess of 500,000 dollars; another, a class consisting of victims whose damages would not require an award over this amount to make individual reparation. Victims in the former class are prevented from recovering for all their damage, while those in the latter class are allowed full recovery. Damage to the physical condition of each malpractice victim is the primary element *1109 of his damage and a primary cause of his being assigned to one of the two classes. Thus, the statutory classification disadvantages or discriminates against one class of individuals by reason of or because of their physical condition.
During the convention debates the delegates made clear that among the reasons physical condition was included in the specific categories was to prevent a legislative classification disadvantaging physically handicapped and crippled persons unless it substantially furthered a legitimate state purpose. See proceedings, Aug. 29-30, 1973, pp. 1017, 1021 and 1029. Catastrophically injured persons such as Jane Sibley are physically handicapped and crippled persons disadvantaged by the statutory classification at issue in this case; they are at least as handicapped, crippled, helpless and in need of the protection of equal laws classifying persons because of physical condition as the persons whom the delegates contemplated in drafting the constitution.
Jane Sibley clearly fits within the class of individuals disadvantaged by the statutory classification. Accordingly, the state or the LSU Board is obliged to show that there is a good reason for the statutory classification, that is, that the legislative classification substantially furthers a legitimate state purpose.
The LSU Board did not make such a showing in the record presented for our review. However, because this is the first case in which we have explored in depth the state constitution's pledge of the protection of equal laws, we will not penalize the defendant for its failure to anticipate our interpretation  although the convention debates clearly reflect the framers' intention. Instead, in the event the case must be remanded to the trial court, it will be instructed to decide whether the statute is constitutional after permitting the parties to introduce evidence and to argue the question.

5. Sovereign Immunity
Plaintiff argued that the statutory restriction on a medical malpractice judgment was invalid because it conflicted with the constitutional prohibition of state immunity from suit or liability for personal injury. La. Const. 1974, art. 12 § 10(A). At the time this case was briefed and argued there was a discrepancy between the treatment of medical expenses under the statute affecting health care providers acting on behalf of the state, La.R.S. 40:1299.39, and that under the private statute affecting qualified health care providers, La.R.S. 40:1299.41. The judgment ceiling of the former statute, which is at issue in the present case, formerly applied to medical expenses as well as to other damages, whereas the judgment limitation of the private statute did not apply to medical expenses. Accordingly, plaintiff argued that cloaking the state with immunity from liability for medical torts above 500,000 dollars, when private tortfeasors were exposed to unlimited liability for medical costs, violated the prohibition of state immunity. After this case was submitted for decision, this statute was amended retroactively to exempt medical expenses from the limitation on general malpractice damages, thus removing the cause for plaintiff's complaint. 1985 La. Acts, No. 239. Because we do not understand plaintiff's argument to be based on any other ground, this contention is now moot.

DECREE
The judgment of the trial court is affirmed insofar as it finds the LSU Board liable for the malpractice of its health care providers, and insofar as it awards costs to plaintiff. The court of appeal judgment is vacated, and the case is remanded to the court of appeal with instructions to award plaintiff medical expenses in accord with Act No. 239 of 1985 and, consistent with this opinion, to determine from the record (1) the damages Sibley suffered other than medical expenses, and (2) whether the LSU Board is directly and independently liable for Sibley's injury and disability, and to render judgment accordingly. In the event the court of appeal determines that the LSU Board is not directly or independently *1110 liable, and that Sibley's damages other than those for medical expenses exceed 500,000 dollars, the appeals court is instructed to remand the case to the trial court and to order that court to decide whether the statute is constitutional after affording both parties an opportunity to adduce evidence and present arguments. All court costs shall be assessed to the defendant.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
CALOGERO, J., concurs in part and dissents in part with reasons.
BLANCHE, J., dissents and assigns reasons.
WATSON, J., concurs in part and dissents in part and assigns reasons.
MARCUS, J., dissents and assigns reasons.
WATSON, Justice, concurring in part and dissenting in part.
The majority opinion allows plaintiff to attempt proof of any independent negligence on the part of the Board, as distinguished from negligence on the part of individuals providing health care services; and forces the state to justify legislative acts which allegedly discriminate. With the first result I agree; from the second, I vigorously dissent.
The majority opinion does a thorough analysis of the statutory provisions relating to the state hospital boards and their employees. For the reasons stated by the majority, I agree that the doctors and others employed in the state hospitals are protected by the statutory limitations but the state hospital boards are not if their independent negligence can be proved.
On the equal protection issue, I dissented in the original opinion. My principal concern was that the injured person could not recover full medical expenses, while others injured in private malpractice situations could do so. The denial of equal protection was obvious. However, that situation has been rectified by Act No. 239 of 1985. All victims of malpractice can now have full recovery of necessary medical expenses. The equal protection problem has been solved.
There is no need to adopt the majority's equal protection analysis which blatantly expands judicial authority in derogation of legislative power. The federal three tier analysis is abandoned, implying an invalidation of the Medical Malpractice Act, or, at a minimum, requiring that the question be relitigated. The newly discovered requirement that the state justify its legislation in court is an unwarranted invasion of matters best left to resolution in the halls of the legislature.
I respectfully dissent from the conclusion of the majority on the equal protection issue and from the remand to take evidence; I concur as to the Board's possible negligence.
CALOGERO, Justice, dissenting in part, concurring in part.
I dissent from that portion of the majority opinion which remands this case to the Court of Appeal for a determination of the independent negligence of the LSU Board of Supervisors. However, I concur in that portion of the opinion which effectively defers our finally determining whether La. Rev.Stat.Ann. § 40:1299.39 (West Supp. 1985) is unconstitutional because in violation of the Louisiana Constitution's equal protection clause.

Independent Board Negligence
Despite the majority's able analysis by which it concludes that under § 40:1299.39 there is no cap placed on liability of the state based upon the state's own negligence, as opposed to the state's vicarious liability for torts of the medical professionals in its employ, I see no reason to perpetuate this case (by remanding it to the court of appeal) for a determination of direct and independent liability on the part of the LSU Board of Supervisors for Miss Sibley's injuries.
First, I point out that I have not been able to find in the record or briefs any *1111 specific allegation that the Board was actively, primarily negligent. The majority opinion notes that the plaintiff's suggestion of Board negligence lies "in permitting psychiatric treatment and administration of drugs by teams without independent patient care review." There is no charge that the Board devised the team approach or instituted it. Instead, it seems clear that the Board, composed of prominent and successful members of the community, no doubt a majority if not all of whom have no medical background, relied on the medical knowledge and expertise of its subordinates in "permitting" team treatment, assuming that it did knowingly "permit" such. Plaintiff's argument contains no allegation of independent negligence, but a thinly disguised espousal of the state's vicarious liability for the suspect treatment instituted by state medical professionals, who are clearly covered by the act. And the majority opinion correctly concludes that La.Rev.Stat.Ann. § 40:1299.39 acts to bar a judgment for damages in excess of the statutory maximum based on the vicarious liability of the LSU Board as the employer of the individual health care provider.
The fact of the matter is, I am not even sure how the primary negligence of the state became a focal point in this case. I surmise that it is the natural progression of the argument by the plaintiff's able attorney that some sort of "corporate negligence," similar to that devised by the courts to impose liability on a hospital notwithstanding the existence of the charitable immunity doctrine, could be applied to the LSU Board of Supervisors to sidestep the partial immunity created by § 40:1299.39. The charitable immunity doctrine, designed to protect the funds of non-profit hospitals and other charitable institutions from tort claims, had been sanctioned by this Court since the early 1900's. However, in response, at least in part, to the criticism directed at the doctrine that neither the courts nor organizers of charities have the authority to put charities beyond the pale of the law applicable to all, and that the protection of life and limb is superior to property interests of charities, this Court, in Grant v. Touro Infirmary, 254 La. 204, 223 So.2d 148 (1969), espoused the concept of "corporate negligence." "Corporate negligence" provided an exception to a hospital's insulation from liability for negligent acts committed within its walls if the hospital itself was found to be negligent, as in the selection of staff or in the performance of its administrative acts. Although the concept of "corporate negligence" has fallen into disuse since the doctrine of charitable immunity, which had fostered the exception, was abolished in 1974 in Garlington v. Kingsley, 289 So.2d 88 (La.1974), plaintiff's counsel would have us resurrect it to impose liability on the LSU Board of Supervisors. If the theory of "corporate negligence" is to be applied, it seems clear that it is the independent negligence of the LSU Medical Center or its administrators, in Shreveport, and not of the more remote LSU Board of Supervisors, that would be under consideration. And there is no indication that there is a corporate body or political subdivision capable of suing and being sued which operates the LSU Medical Center in Shreveport. The directing staff of the Medical Center is more than likely composed of medical professionals, who are covered by the acts and for whose tortious conduct the act limits recoverable damages for the LSU Board's vicarious liability. In all events it is only the LSU Board of Supervisors which has been sued here.

Louisiana Constitution's Equal Protection Clause
I concur, however, in the majority's treatment of the equal protection issue. Notwithstanding our decree in the original opinion, which asserted that the provisions of La.Rev.Stat.Ann. § 40:1299.39 do not violate the equal protection clause of the state, or federal, constitutions, the fact of the matter is that our exclusive attention in that original opinion was directed to the federal equal protection clause. U.S. Const. amend. XIV, § 1. In that opinion, there was an underlying assumption that the state's equal protection clause was *1112 identical to the equal protection provision in the United States Constitution and should be interpreted in the same way. Upon reconsideration, the majority here has concluded, and properly so, that the Louisiana equal protection clause is separate and distinct from its federal counterpart, as indicated by the majority's reference to the actual wording of the clauses as well as the Louisiana constitutional debates. Whereas the federal constitution forbids the denial "to any person within its jurisdiction the equal protection of the laws," the Louisiana constitution bars laws which "arbitrarily, capriciously, or unreasonably discriminate against a person" with regard to physical condition, as well as birth, age, sex, culture, or political ideas or affiliations. As such, the United States Supreme Court's interpretation of relevant provisions of the federal constitution cannot replace "our independent judgment in construing the constitution adopted by the people of Louisiana." State v. Hernandez, 410 So.2d 1381, 1385 (La.1982).
Because of the possibility that § 40:1299.39 may be constitutionally infirm under Article I, Section 3 of the 1974 Louisiana Constitution, while passing muster under the appropriate standards as applied to the federal equal protection clause by the United States Supreme Court, I endorse the majority's decision to defer the Court's final determination concerning whether § 40:1299.39 is constitutional. Although this Court is the final arbiter of whether any act offends the prevailing Louisiana Constitution of 1974 I believe that a remand, to hear both evidence and legal arguments as directed by the majority, is appropriate where these important matters were not addressed specifically in the district court's original hearing, and decision.
The majority remands to the Court of Appeal to determine if Miss Sibley's damages, other than those for medical expenses, exceed $500,000. If the damages are found to be in excess of the cap established in § 40:1299.39, it is appropriate, as the majority finds, for the Court of Appeal in turn to remand the matter to the trial court to determine, with the benefit of an evidentiary hearing, whether the statute discriminates "arbitrarily, capriciously, or unreasonably" against Miss Sibley (and others like her) because of her "physical condition." La. Const. art. I, § 3. In so determining, the trial court must consider the state's purpose in enacting this legislation. To comply with the state's guarantee of equal protection in the Constitution of 1974, this classification (of seriously injured medical malpractice victims who are not entitled to full recovery for their damages) must be found to reasonably further a legitimate state purpose.
MARCUS, Justice (dissenting).
I dissent from the remand of this case to the court of appeal for a determination of the independent negligence of the LSU Board of Supervisors. I also dissent from the majority's equal protection analysis. In this respect, I agree with the remarks of Justice Watson in his dissenting opinion.

[ON REHEARING]
BLANCHE, Justice (dissenting).
This writer supports the original opinion in this matter holding that the Medical Malpractice Act (La.R.S. 40:1299.39 et seq., hereinafter referred to as the "Act.") is applicable to the State of Louisiana and its agencies, and that the provisions of the Act do not unconstitutionally violate either the equal protection or the due process clause of the state or federal constitutions, nor Article XII, Section 10 of the Louisiana Constitution of 1974, the provision on soveriegn immunity.
On rehearing, the majority in finding that the $500,000 cap on liability accorded under the Act does not inure to the benefit of the state or its agencies for their independent acts of negligence (as opposed to their vicarios liability for the acts of their physician-employees) makes an analysis of the legislative intent in enacting the statute, and finds that the State of Louisiana or its agencies were not the type of "health care providers" that the legislature had in *1113 mind when it passed the Act. Such a finding based on legislative intent is unwarranted when it is considered that it excludes from the protection of the Act the largest health care provider of them all  the State of Louisiana. It is highly doubtful that this was their intention. The Court of Appeals was correct in giving a broad interpretation to the Act, and Justice Calagero was correct in finding the Act applicable to all liability arising out of state services.
It would seem that since the majority accorded plaintiff relief under the guise of statutory interpretation, it was not necessary to reach the constitutional question of equal protection. As stated in State v. Stripling, 354 So.2d 1297 (La.1978), "[c]ourts are directed by a long line of decisions, both federal and state, and by a general propositions applicable to constitutional government, not to pass upon the constitutionality of an act of the legislature if the case can properly be decided on another ground." It was necessary in our original opinion to address the constitutional issues, and because I find the Act applicable to both the state and its agencies, I am compelled to address the constitutional issues.
Besides what this writer believes is a premature consideration by this Court of the constitutional issues, the majority further compounds the error by abrogating many years of considered jurisprudence, which developed the three-level analysis, in the equal protection area, see Acorn v. City of New Orleans, 377 So.2d 1206 (La. 1979); Succession of Brown, 388 So.2d 1151 (La.1980), and Lovell v. Lovell, 378 So.2d 418 (La.1979); Everett v. Goldman, 359 So.2d 1256 (La.1978); instead, opting for a uniform standard of judicial review which all legislation is to be judged under (a substantial furtherance of a legitimate "state purpose" test).
Additionally, the majority finds that Article 1, Section 3 of the Louisiana Constitution of 1974, dealing with individual dignity, commands that this Court apply a more rigorous test than the "rational relationship" test. This writer is of the opinion that the Louisiana Constitution does not nor was it intended to provide greater protections in the area of equal protection than those accorded under the federal constitution. Article 1, Section 3 provides in part;
... No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of ... physical condition....
For the reasons set forth in our original opinion, and for the following reasons, this writer is of the opinion that this Article mandates that the Act be judged under the "rational relationship" test.
First, it should be noted that the victim's right to full tort recovery is not fundamental. Additionally, the victim is not a member of a suspect class. Lastly, the victim does not fall within the "mean scrutiny" test accorded to constitutionally protected rights less than fundemental. See Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). Therefore, for the victim to be accorded a higher level of scrutiny, such must arise from the language of Article 1, Section 3. Under the expressed language of the Article, the terms used are synonimous with the term irrational, or lacking a rational basis. The majority's delving into the constitutional debates is clearly unwarranted in light of the clear text of our constitution. Hebbler v. New Orleans Fire Dept., 310 So.2d 113 (La.1975).
Applying the "rational relationship" test to the Act, this writer believes that the limitation of liability on state medical malpractice claims is reasonably related to the legitimate state interest of assuring the availability of affordable public health care to the citizens of this state.
Finally, while not agreeing with the majority's statement of the level of judicial review, it should be observed that the majority incorrectly remands this case for an evidentiary hearing and briefing on the equal protection issue. In so doing, the majority places the burden of proof on the state; requiring it to prove that the Act is substantially related to a legitimate state purpose. Even assuming that the majority's *1114 standard is correct, it is incorrect to require the state to bear any burden. It is an axiomatic principle of constitutional law that a legislative act is presumed constitutional, State v. Petrovich, 396 So.2d 1318 (La.1981), and the burden of proof is on the party attacking its constitutionality.
For the reasons stated above, I respectfully dissent. The effect of the majority opinion is that any time the legislature enacts a law to address a particular problem that it determines exists, this Court, years later will address the wisdom of the law based upon an alleged allievation of the past problem. This is not the function of this Court. White Systems of New Orleans v. Hall, 219 La. 440, 53 So.2d 227 (1951).
NOTES
[1] Notwithstanding any other provision of the law to the contrary, no judgment shall be rendered and no settlement or compromise shall be entered into for the injury or death of any patient in any action or claim for an alleged act of malpractice in excess of five hundred thousand dollars plus interest and costs, exclusive of future medical care and related benefits valued in excess of such five hundred thousand dollars. La.R.S. 40:1299.39(B).
[2] La.R.S. 40:1299.39(A)(5) (emphasis added).
[3] La.R.S. 40:1299.39(A)(6) (emphasis added).
[4] La.R.S. 40:1299.39(A)(1) (emphasis added).
[5] La.R.S. 40:1299.39(A)(4).
[6] La.R.S. 40:1299.39(C) (emphasis added).
[7] La.R.S. 40:1299.42(B).
[8] La.R.S. 40:1299.41(A)(8) (emphasis added).
[9] La.R.S. 40:1299.41(A)(2) (emphasis added).
[10] La.R.S. 40:1299.41(A)(4) (emphasis added).
[11] La.R.S. 40:1299.41(A)(7).
[12] La.R.S. 40:1299.41(A)(7).
[13] La.R.S. 40:1299.39(A)(1), (2), (5), (6).
[14] La.R.S. 40:1299.39(A)(1).
[15] Cabell v. Chavez-Salido, 454 U.S. 432, 102 S.Ct. 735, 70 L.Ed.2d 677 (1982); Ambach v. Norwich, 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979); Foley v. Connelie, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978).
[16] Michael M. v. Sonoma County, 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981).
[17] Zobel v. Williams, 457 U.S. 55, 102 S.Ct. 2309; 72 L.Ed.2d 672 (1982); Logan v. Zimmerman Brush Co., 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); Dept. of Agriculture v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).
[18] City of Cleburne v. Cleburne Living Center, ___ U.S. ___, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).
[19] See e.g., Shaman, "Cracks in the Structure: the Coming Breakdown of Levels of Scrutiny," 45 Ohio State L.J. 161 (1984); Seeburger, "The Muddle of the Middle Tier: the Coming Crisis in Equal Protection," 48 Missouri L.Rev. 587 (1983); Hutchinson, "More Substantive Equal Protection: A Note on Plyler v. Doe," 1982 Supreme Ct.Rev. 167 (1982); Gunther, "In Search of Evolving Doctrine on a Changing Concept: A Model for a Newer Equal Protection," 86 Harv. L.Rev. 1 (1972).
[20] "Mr. Dennery: The authors believe that there is absolutely no basis for any discrimination of any sort on the basis of, on account of race or religion, but they do believe that there can be discrimination if it is not arbitrary, not capricious, and not unreasonable as far as the other items contained in the original committee report are concerned." (emphasis added) (State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts Vol. VI, Aug. 30, 1973, p. 1029 [hereinafter referred to as Proceedings]).
[21] "Mr. Roy: [T]his section simply means ... that all laws must be reasonable with respect to any discrimination imposed on any person [in the categories listed].... Legally, it merely shifts to the state the burden of proving that if a law or policy is discriminatory with respect to any of these categories, the state must prove that the basis for the discrimination is founded on reason.

* * * * * *
"[This section] would simply shift ... the burden of proof from the individual when he shows that he is discriminated against...." (Proceedings, Aug. 29, 1973, p. 1016) (emphasis added). See generally, Proceedings, Aug. 29, 1973, pp. 1017-18.
[22] "Mr. Roy: [Persons who are not in the classes enumerated] have the burden of proving two things. The discrimination against them in whatever class they happen to be, and the fact that there is no reasonable basis for it, but it appears to me that there would be few people who have not been contemplated who would have [this] double burden...." Proceedings, Aug. 29, 1973, p. 1018.
[23] See Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1, 6 (1974).
[24] "Mr. Roy: We feel that we have to enumerate these various rights because we think that our citizens are entitled to have our court protect them in the future. It's been too many times that even the Supreme Court of United States had dodged the issue with respect to equal protection. We want to make sure that our justices can clearly understand that when you're going to discriminate, when the state will discriminate against a person for any one of these categories, then the state must show a reasonable basis for it. We consider that even for the physical condition." (Proceedings, Aug. 29, 1973, p. 1017). See also footnote 17, supra.
[25] See footnotes 18 and 19, supra.
[26] Proceedings, Aug. 29-30, 1973, pp. 1022-30.