MAX N. TOBIAS, JR., Judge.
hThe plaintiffs/appellants, Patrick and Janice Russo, individually and on behalf of their minor children,[1] appeal from a summary judgment in favor of the defendants/appellees, the State of Louisiana and Steven Kraus, M.D. The trial court found that the three-year prescriptive period established by La. R.S. 9:5628 for medical malpractice actions was constitutional, thereby dismissing the plaintiffs/appellants claims with prejudice.
In August 1998, Janice Russo, who was being treated by John Megison, M.D., underwent a routine PAP smear which revealed a low grade squamous cell intraep-ithelial lesion and mild dysplasia without malignancy.[2] A uterine cervix |2biopsy was performed that revealed moderate-severe dysplasia without malignancy.[3] Dr. *944 Megison recommended a hysterectomy, which was performed. The tissue removed during the surgery was sent to the pathology lab at Lakeside Hospital in Me-tairie, Louisiana, on 9 October 1998 for analysis. The defendant/appellee’s (Dr. Kraus) analysis of the tissue resulted in the following findings:
The cervix contains extensive areas of severe dysplasia/carcinoma in situ with involvement in endocervical glands. In areas, there is a pronounced inflammatory response surrounding some of the areas of glandular extension of carcinoma in situ and focal areas of superficial microinvasion from these sites cannot be ruled out. No definitive evidence of invasive carcinoma is identified, however. [Emphasis supplied]
In 2005, Mrs. Russo noticed a lump in her neck about the size of a pea. She had a biopsy which revealed a malignancy. Mrs. Russo was initially diagnosed at M.D. Anderson Hospital in Houston, Texas, with an unknown primary malignancy. On 5 January 2006, Renato Lenzi, M.D., opined that “given the tumor histology and lymph node distribution with dominant disease in the pelvis and the fact that there is a prior hysterectomy showing massive amounts of in situ, carcinoma in the cervix ... the most likely diagnosis is that of metastic squamous cervical cancer.”
In January 2006, Ralph Freedman, M.D., a gynecologist at M.D. Anderson Hospital, requested that Lakeside Hospital send the original slides from the Ighysterectomy. He was told that the slides were missing and that new tissue would have to be cut from the original tissue samples. On 30 January 2006, Dr. Kraus reported the finding of “invasive poorly differentiated squamous carcinoma of the uterine cervix ... squamous carcinoma in situ with endocervical gland involvement.” Mrs. Russo was advised by her doctors of the findings; she later died from the disease. She is survived by her husband and three children.
Mrs. Russo received her first indication of a problem in 2005 when she felt a lump in her neck approximately seven and one-half years from the time Dr. Kraus analyzed the tissue from her hysterectomy. La. R.S. 9:5628 as written would require Mrs. Russo to file her medical malpractice claim four and one-half years before her discovery that malpractice may have occurred.
In May 2006, the plaintiffs/appellants filed a petition for declaratory judgment against Dr. Kraus, seeking a declaration that La. R.S. 9:5628 is unconstitutional for violating La. Const. Article I, § 3 (equal protection) and La. Const. Article I, § 22 (access to the courts). The plaintiffs/appellants also filed a petition for a medical review panel with the Louisiana Patient’s Compensation Fund.
On 26 July 2006, the State of Louisiana filed a petition of intervention. Thereafter, the plaintiffs/appellants filed a supplemental and amended petition in which they averred that their claim had prescribed on its face under La. R.S. 9:5628, but again asserted that the statute was unconstitutional.
|4A Sibley hearing was set for 16 January 2009 to determine the constitutionality of La. R.S. 9:5628.[4] The hearing was continued until 13 April 2009, and later continued without date. Meanwhile, the de *945 fendants filed a peremptory exception of prescription and two motions for summary judgment: the first asserted that La. R.S. 9:5628 did not discriminate on the basis of physical condition and the second asserted that the statute was constitutional. The plaintiffs/appellants opposed both motions. The trial court decided to hear the motions first and later hold the Sibley hearing, if necessary. On 18 September 2008, the trial court granted the motions for summary judgment; the exception of prescription was never argued.
On 23 September 2009, the parties entered into a stipulation that, in light of the summary judgments, the plaintiffs/appellants’ claim had prescribed under La. R.S. 9:5628, but reserved their rights to appeal the summary judgments and the exception of prescription that was later granted by the trial court. The two cases were consolidated and this timely appeal followed.
The plaintiffs/appellants have assigned four errors for review. First, they claim that the trial court committed reversible error by failing to hold a Sibley hearing before dismissing the case. Next, they argue that the trial court erred by granting the motions for summary judgment. The plaintiffs/appellants also contend that the trial court erred by granting the exception of prescription and, finally, that the trial court erred by finding La. R.S. 9:5628 constitutional.
Normally, “[w]hen prescription is raised by peremptory exception, with evidence being introduced at the hearing on the exception, the trial court’s findings | sof fact on the issue of prescription are subject to the manifest error-clearly wrong standard of review.” London Towne Condominiums Homeowner’s Ass’n v. London Towne Co., 2006-401, p. 4 (La.10/17/06), 939 So.2d 1227, 1231. However, in the instant case, the exception of prescription was granted by the trial court based on the parties’ stipulation. Since summary judgments are reviewed de novo, we apply that standard of review.
The plaintiffs/appellants first contend that the trial court committed reversible error by failing to hold a Sibley hearing before granting the motions for summary judgment.
In Sibley v. Board of Supervisors of Louisiana State University, 477 So.2d 1094 (La.1985), the Supreme Court considered the constitutionality of La. R.S. 40:1299.39, which provides a malpractice judgment limitation of $500,000 for state medical services. The plaintiffs argued, inter alia, that the statute was invalid because it conflicted with the constitutional guarantee of equal protection and the constitutional prohibition against state immunity from suit and liability for personal injury.
The Court stated that when a law classifying individuals on the basis of physical condition is attacked, the proponent of the legislation must show that the law does not arbitrarily, capriciously, or unreasonably discriminate against the disadvantaged class by demonstrating that the legislative classification substantially furthers a legitimate state objective.[5] Because the statu *946 tory provision 1 (¡prohibiting a malpractice judgment in favor of a severely injured and disabled person in excess of $500,000 classified individuals based on their physical condition, the Court remanded the case to afford the parties an opportunity to introduce evidence on the issue. Id. at 1104-05. In subsequent cases, this process has been referred to as a “Sibley hearing.”[6]
We agree with the plaintiffs/appellants that a Sibley hearing is the preferred method to test the constitutionality of this statute. We also agree that the failure to hold the hearing is reversible error in this case.
The starting point of our analysis is the governing statute, La. R.S. 9:5628, which provides in pertinent part:
A. No action for damages for injury or death against any physician, chiropractor, nurse, licensed midwife practitioner, dentist, psychologist, optometrist, hospital duly licensed under the laws of this state, or community blood center or tissue bank as defined in R.S. 40:1299.41(A), whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect. [Emphasis supplied.]
In In re Medical Review Panel Claim of Moses, 00-2643, pp. 7-10 (La.5/25/01), 788 So.2d 1173, 1178-80, the Supreme Court described La. R.S. 9:5628 as a “tripartite prescription provision:”
First, a one-year prescription period '(which parallels the general tort period) is the general rule, which applies to all types of medical malpractice actions. Under this general rule, such actions prescribe one year from the date of the alleged act, omission or neglect. This rule applies when the damages are immediately apparent.
Second, in cases involving damages that are not immediately apparent, a discovery exception to the general rule is codified. The discovery exception embodied in Section 5628 is a codification of the fourth category of contra non valen-tem for cases in which the cause of action is not immediately knowable. Under this discovery rule, such actions prescribe one year from the date of discovery of the alleged act, omission or neglect.
Third, an overall limitation is placed on cases otherwise falling within the discovery rule. That overall limitation ... provides that “in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission or neglect.” La. Rev.Stat. 9:5628 (emphasis supplied). Translated, this means that “the contra *947 non valentem type of exception to prescription embodied in the discovery rule is expressly made inapplicable after three years from the alleged injury causing act, omission or neglect.” Boutte v. Jefferson Parish Hospital Service District No. 1, 99-2402 at p. 5 (La.4/11/00), 759 So.2d 45, 49.
The plaintiffs/appellants argue that La. R.S. 9:5628 violates the equal protection guarantees of La. Const. Art. I, § 3 because (1) it discriminates against those who sustain injury at the time of the alleged negligent act or omission but whose injury is not reasonably discoverable or cognizable until after the lapse of the three-year prescriptive period, unlike the injuries of most malpractice claimants; (2) it classifies personal injury victims of medical malpractice whose injuries do not manifest themselves within the three-year prescriptive period ^differently than all other personal injury tort victims; and (3) it discriminates on the basis of severity of injury.[7] Thus, they contend that for one or more of these reasons, the statute discriminates on the basis of physical condition.
Article I, Section 3 of the Louisiana Constitution provides that a person shall not be denied the equal protection of the laws and that no law shall arbitrarily or unreasonably discriminate against a person because of physical condition. When a statute classifies persons on the basis of physical condition, the burden is on the state or other advocate of the law to prove that the classification has a reasonable basis. However, a law which classifies individuals on a basis outside the scope of La. Const, art. I, § 3 will be upheld, unless a member of the disadvantaged class shows that the statute does not suitably further any appropriate state interest. Crier v. Whitecloud, 496 So.2d 305 (La.1986); Sibley, supra.
In Sibley, 477 So.2d 1094, the Court addressed what is required to declare a statute unconstitutional pursuant to La. Const. Art. I, § 3:
We determined that Article I, Section 3 of the 1974 Louisiana Constitution necessitates that: (1) A statute shall be repudiated completely if it classifies individuals by race or religious belief; (2) A statute’s enforcement shall be refused absent a showing that the classification has a reasonable basis when the statute classifies persons on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliations; and (3) A statute shall be rejected when the law classifies on any other basis, and a member of the disadvantaged class shows that it does not suitably further any appropriate state interest.
Sibley, 477 So.2d at 1104.
In Crier, a physician implanted a metal rod in Ms. Crier’s back in 1978 to correct scoliosis. In March 1982, she began to experience severe back pain and |9learned that the rod in her back had broken. Ms. Crier filed suit within one year of this discovery, but more than three years after the date of her back surgery.
Whether a claimant’s delay in filing suit was due to a latent disease or because the consequences of a prior act could not be detected for an extended time period, Ms. Crier, like Mrs. Russo here, could not have known of her injury before the expiration of the statutory limitation period. Nevertheless, the Supreme Court held that Ms. Crier’s equal protection rights were not violated because La. R.S. 9:5628 equally affects all persons who undergo medical *948 treatment. The Court stated that La. R.S. 9:5628 provides notice that malpractice claims will be barred if not filed within three years from the act, omission, or neglect. The Court further stated that the statute is a legislative determination, that three years is a reasonable period of time in which to assert a medical malpractice claim, and does not create a classification which discriminates against one class of individuals because of their physical condition. Crier, 496 So.2d at 310.
The next question in an equal protection argument analysis is whether the statute in question furthers a legitimate state interest. In Branch v. Willis-Knighton Medical Center, 92-3086, pp. 9-10 (La.4/28/94), 636 So.2d 211, 215, overruled on other grounds, David v. Our Lady of the Lake Hospital, 02-2675 (La.07/02/03), 849 So.2d 38, the Court addressed this issue:
The purpose of the statute is to check the increase in medical malpractice insurance premiums by restricting the volume and retrospective nature of medical malpractice litigation. There is no evidence that the legislature intended by R.S. 9:5628 to curb any type of litigation other than traditional medical malpractice actions.
During the 1970’s [sic] he rising costs of medical malpractice insurance and the decreasing availability of such coverage gave rise to the perception of a “medical | inmalpractice crisis” in certain states. Note, Constitutional Law — Louisiana Medical Malpractice Review Panel Upheld Under Equal Protection Scrutiny, 53 Tul.L.Rev. 640, 641 (1979). In 1975, the legislatures of many states, prompted by the lobby of the American Medical Association and the malpractice insurance companies (AMA lobby), enacted significant changes in substantive and procedural laws governing the adjudication of medical malpractice claims. Id., and sources cited therein. Legislation was adopted to limit the amount of awards, constrain attorneys’ contingent fees, shorten and tighten statutes of limitations, redefine medical standards of care, and require pretrial screening or arbitration of claims. Id.
[[Image here]]
In Louisiana, in response to or in anticipation of a malpractice insurance crisis, the legislature in its 1975 regular session, adopted a series of laws limiting the rights of medical malpractice claimants. Besides the special statute of limitations for medical malpractice claims, R.S. 9:5628, the legislation successfully promoted by the AMA lobby included the Uniform Consent Law, R.S. 40:1299.40; the Medical Malpractice Act, R.S. 40:1299.41 et seq; and the law strengthening the powers of the State Board of Medical Examiners, R.S. 37:1261 et seq. See Note, supra, 53 Tul.L.Rev. at 642 n. 10.
After reviewing the appellate record, however, we find that the plaintiffs/appellants present a compelling argument that La. R.S. 9:5628 fails to further an appropriate state interest as applied to Mrs. Russo and others- similarly situated. In Whitnell v. Silverman, 93-2468, p. 6 (La.App. 4 Cir. 11/4/94), 646 So.2d 989, 994, reversed on other grounds, 95-0112 (La.12/6/95), 686 So.2d 23, the trial court held a three-day hearing that presented extensive evidence on the issue of whether a medical malpractice insurance crisis existed when La. R.S. 9:5628 was originally enacted (or later when the act was substantively amended). In its reasons for judgment, the trial court stated:
The evidence establishes that the Legislature enacted Act 808 of 1975 without the benefit of actuarial evidence specifi *949 cally applicable to Louisiana’s situation in 1975. |n Moreover, analyzing Mr. Lowe’s, Mr. Wood’s and Mr. Hurley’s testimony, the Court finds that it is more probable than not that although the quantity of medical negligence cases being filed, the amounts being paid out by insurers, etc., were increasing, such was a normal actuarial aberration in figures that did not at that time (1975) warrant substantive action by the Legislature.[8]
1As recognized by our brethren of the Second Circuit Court of Appeal, Louisiana appellate courts presented with attacks on the constitutionality of La. R.S. 9:5628, as applied to diseases with latency periods in excess of three years, have upheld the statute on equal protection grounds.[9] *950 Walker v. Bossier Medical Center, 38,148, pp. 4-5 (La.App. 2 Cir. 5/12/04), 873 So.2d 841, 844 (hereinafter “Walker I ”), decided by a vote of 3-2, held that the statute was an unconstitutional deprivation of due process as applied to Mrs. Walker, who had contracted Hepatitis C during a 1981 blood transfusion. The court also stated:
To find La. R.S. 9:5628 constitutional as applied to plaintiffs who suffer from diseases with latency periods which prohibit their manifestation and discovery until well after the three-year, event-oriented period provided by Section 5628 would be to prevent a small number of the least blameworthy, yet most seriously injured claimants from having their day in court. To do so would divest such plaintiffs of their fundamental right to due process through the legal system while allowing defendant health care providers to avoid accountability and litigation.
Id. at pp. 6-7, 873 So.2d at 845. [Emphasis in original.] However, the court limited its conclusion to hold that La. R.S. 9:5628 was unconstitutional only as applied to these claimants. In declining to apply R.S. 9:5628 to bar the plaintiffs’ cause of action in Walker I, the court found that:
I isiWJhile the Medical Malpractice Act, including its peremptive period, is rationally related to a legitimate government interest, reasonable medical costs, and readily available health care, the statute’s rote application in the case sub judice does not further such interests and ignores the rights of innocent medical malpractice claimants. To require a plaintiff to assert a claim before the alleged malpractice and resulting injury are discoverable imposes an impossible condition on her access to the courts and the pursuit of her tort remedy.
Id. at p. 7, 873 So.2d at 845.
The hospital sought review by the Supreme Court. Finding that Walker I appeared to conflict with Williams v. Jackson Parish Hospital, 33,847 (La.App. 2 Cir. 10/20/00), 768 So.2d 866, rev’d on other grounds, 00-3170 (La.10/16/01), 798 So.2d 921, the Supreme Court vacated the judgment and remanded the case for an en banc hearing. Walker v. Bossier Medical Center, 04-1797 (La.2/25/05), 894 So.2d 1096.[10]
On remand, the court en banc found the statute constitutional. See Walker v. Bossier Medical Center, 38,148 (La.App. 2 Cir. 5/11/05), 902 So.2d 1228. The court stated that to successfully challenge the validity of Section 5628 on equal 114protection grounds, the plaintiffs bore the burden of proving that the statute did not further an appropriate state interest. However, the *951 court found that the plaintiffs failed to satisfy their burden in light of prior Supreme Court findings that the three-year limitation period was intended by the legislature to alleviate increased insurance costs attributed to the extended period available for filing medical malpractice claims and that the statute was rationally related to the state’s interest in attempting to provide the public with accessible health care at reasonable costs. Id. at p. 7, 902 So.2d at 1234-35.
In Whitnell v. Silverman, 95-0112 (La.12/6/95), 686 So.2d 23, the Supreme Court reversed this court’s finding that La. R.S. 9:5628 violated La. Const. Art. I, § 3, in that it unreasonably discriminated against Mrs. Whitnell on the basis of physical condition, thereby creating a classification prohibited by the Louisiana Constitution. To support our position, we noted the testimony of Stuart Hoffman, M.D., who provided an illustrative list of 19 diseases with latency periods in excess of three years. The list of the 19 diseases with latency periods in excess of three years consisted of the following:
1. Carcinoma of the cervix-in situ-pap smear
2. Mammographie evidence of breast eareinoma-non-palpable
3. Familial hypolipidemia
4. Asymptomatic coronary atherosclerosis
5. Early stage multiple myeloma
6. Von Willbrand’s disease
7. Leukoplakia
8. Colon polyps
9. Malignant melanoma behind ear
10. Aneurysm — thoracic aorta — cerebral artery
11. Early stage ovarian carcinoma
12. Chronic active hepatitis
13. First degree heart block
|1fil4. Second degree heart block
15. Petit mal seizures
16. Congenital absence of the spleen
17. Pernicious anemia
18. Gout
19. Blood Transfusion Acquired AIDS
The Court found Section 5628 constitutional as applied to Mrs. Whitnell as her medical condition was discoverable within the three-year period. Additionally, because her medical condition was not included among the nineteen diseases listed above, the Court held that the lower courts erred in finding the statute unconstitutional as applied to individuals with diseases which have latency periods in excess of three years. Because she was not in the class of persons with latent diseases, the plaintiff had no standing to assert constitutional attacks for third parties who were not before the Court. However, the Court stated:
This ruling by the Court does not address the constitutionality of La. R.S. 9:5628 as it applies to individuals with diseases that have latency periods in excess of three years. The court has basically declined to decide on this issue because it is not presently before it.
Id. at p. 9 n. 13, 686 So.2d at 29 n. 13.
In his dissent in Whitnell, Justice Lem-mon noted:
A case with a lengthy latency period might call for our reexamination of the Crier decision on the constitutionality of Section 5628. Section 5628 distinguishes not only between victims of medical malpractice and victims of other torts, but also between medical malpractice victims with injuries that manifest themselves within three years and victims with injuries that remain latent beyond three years. While such classifications are usually analyzed for equal protection purposes under a rational ba *952 sis standard (the asserted rational basis being the perceived medical malpractice insurance crisis in the 1970s), there are also due process implications to the analysis.
There have been suggestions that only a small percentage of medical malpractice claimants are affected hr,by a three [sic] year statute of repose. The converse, however, is equally true — only a small percentage of claims against health care providers are eliminated by such a statute. Depriving a few perhaps horribly injured innocent victims of their claims in order to relieve a few health care providers of late filing problems such as lost evidence, faded memories and unavailable witnesses appears to be fundamentally unfair, which is the hallmark of a due process violation. The medical malpractice victim, who has the ultimate burden of proof at trial, labors under the same difficulties caused by the late manifestation of an injury, which is not attributable to the victim.
Id. at p. 3 n. 5, 686 So.2d at 33 n. 5. [Citation omitted.]
In David v. Our Lady of the Lake Hospital, 02-2675, p. 18 (La. 07/02/03), 849 So.2d 38, 51-52, the Court again left open the issue of the constitutionality of the statute as it applies to an action filed by a claimant with a disease whose latency period exceeds three years:
Nevertheless, equity suggests that since the jurisprudence addressing the applicability of LSA-R.S. 9:5628 to a cause of action such as David’s has been in a state of flux, remand is proper under the extraordinary circumstances encountered during this prolonged litigation. Further, this court has left open the issue of the constitutionality of LSA-R.S. 9:5628 as it applies to bar an action by a person suffering from a disease with a latency period in excess of three years. See Whitnell v. Silverman, 95-0112, p. 9 n. 13 (La.12/06/96), 686 So.2d 23, 29 n. 13. Pursuant to LSA-C.C.P. art. 2164, which permits appellate courts to remand cases when the interest of justice is served, we sustain OLOL’s exception of prescription, but remand this matter to the trial court to allow David an opportunity to file an amended petition urging the constitutional challenge. [Emphasis supplied; footnotes omitted.][11]
In the instant case, the parties agree that Mrs. Russo died from squamous carcinoma in- situ, a disease with a latency period exceeding three years. One can J^say that the record before us shows that her medical condition is substantially identical and/or similar to the first disease on the Whitnell list. In order to be more certain, on remand at the Sibley hearing, the parties should put forth evidence into the record to establish that squamous carcinoma in situ is one of the nineteen diseases in Whitnell and/or that it should be added to the list of nineteen.[12] We note further that the Supreme Court has neither criticized nor repudiated that list. On two separate occasions, the Court has acknowledged that the issue presented herein is open.
Consequently, we presently decline to find that La. R.S. 9:5628 is unconstitutional as applied to Mrs. Russo and third parties with diseases with latency periods *953 in excess of three years by violating La. Const. Art. I, § 3. The statute, although facially neutral, creates two classes of medical malpractice victims: (1) those whose injuries are discoverable within three years and (2) those whose injuries are not. As applied to the second class, the statute does not afford them the same protections as it does to the first class.
The plaintiffs/appellants also challenge the constitutionality of La. R.S. 9:5628 on the basis that its application deprives them of the constitutional right to access to the courts. Article I, Section 22 of the Louisiana Constitution of 1974 provides:
All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights.
11sAs the Supreme Court determined in Crier, supra, the constitutional guarantee of access to courts and a remedy for injuries does not warrant a remedy for every single injury. In that case, the Court examined the historical background of Article I, Section 22 of the Louisiana Constitution and concluded that in adopting this constitutional article, the Constitutional Convention did not intend to limit the legislature’s ability to restrict causes of action or to bar the Legislature from creating various areas of statutory immunity from suit. The Court further acknowledged that the establishment of statutes of limitations (prescriptive periods) is within the scope of legislative authority, and that enactment of same does not eliminate the remedy for a civil wrong. The Legislature essentially makes a legislative determination that after a certain period of time, no cause of action can arise. Moreover, “[wjhere access to the judicial process is not essential to the exercise of a fundamental constitutional right, the legislature is free to allocate access to the judicial machinery on any system or classification which is not arbitrary.” Crier, 496 So.2d at 310 (citing Bazley v. Tortorich, 397 So.2d 475 (La.1981)).
In the case at bar, one may reasonably assert that Mrs. Russo was part of a class disadvantaged by the enforcement of La. R.S. 9:5628, and further, that the statute is unconstitutional as applied to her under the facts of this case. The evidence so far appears to indicate that Mrs. Russo could not have discovered her cervical cancer within the three years afforded by the statute. Under these circumstances, one may reasonably assert that- Mrs. Russo was afforded less consideration or protection than other tort or medical malpractice victims subject to the statutory prescriptive periods promulgated by the Legislature. But again, we 119presently decline to find that La. R.S. 9:5628 unconstitutionally deprived Mrs. Russo of access to the courts under the facts of this case.
In Kenyon v. Hammer, 142 Ariz. 69, 688 P.2d 961 (1984)(en banc), the ' Supreme Court of Arizona addressed the question of whether its three-year statute of limitations for medical malpractice actions was constitutional. The plaintiff therein could not have known that her doctor committed malpractice until approximately six years after the “injur/’ took place. The trial court granted the defendant health care providers’ motion for summary judgment, which was reversed by the intermediate appellate court. The Supreme Court granted review.
When reviewing the equal protection claim under the Arizona constitution, the Court applied a strict-scrutiny test similar to that of Louisiana: “Under this method a discriminatory statute may be upheld only if there is a ‘compelling state interest’ to *954 be served and the regulation is ‘necessary’ to achieve the legislative objective.” Id. at 78, 688 P.2d at 970. To aid it in its determination, the Court relied on the evidence in the record:
The parties seem to agree that the statistics contained in the Report of the Secretary’s Commission on Medical Malpractice, supra at 254, indicate that over 88% of all medical malpractice injuries which result in claims are reported within the first two years following injury, that 95 to 96% of all claims have been reported within three years, 97% within four years and only 2% are unreported after five years. ATLA Amicus Brief at 3; defendant’s supplemental brief at 17; see also S. Law and S. Polan, Pain and Profit: The Politics of Malpractice 122-23 (1978), quoting the National Association of Insurance Commissioners study of claims paid from July of 1975 through June of 1976. These statistics indicate to us that the “long tail” caused by the discovery rule is not a significant portion of the problem. If prompt actuarial certainty is required, reduction of the statute of limitations would have been a much more rational method of achieving the compelling state interest than abolition of the discovery rule and consequent abrogation |anof the few and unusual claims where, because of lack of knowledge or disability, the claimant was unable to bring the action within the flat time limits.
Id. at 86, 688 P.2d at 978.
Although we find that Kenyon was sufficient evidence for Arizona’s purposes to establish no insurance crisis existed in 1975, being the same time frame of when La. R.S. 9:5628 was first enacted or when subsequent substantive amendments were passed, no evidence exists in the appellate record before us that the small percentage of claims that might be filed by an injured party would have any effect on either healthcare costs, malpractice insurance premium rates, or the affordability of healthcare in Louisiana. To be certain that such was the case in Louisiana in 1975 and when substantive amendments to Section 5628 were enacted, we find that a remand is warranted. Thus, we find that a Sibley hearing is warranted for the purpose of placing into evidence the necessary testimony, documents, and other evidence to permit the trial court to reach a conclusion.
Based on the foregoing, we do not presently hold or find La. R.S. 9:5628 unconstitutional as applied to the narrow group identified above. Consequently, we reverse the summary judgments and exception of prescription granted by the trial court. We remand the matter for further proceedings consistent with this opinion. At the Sibley hearing, the court should consider, inter alia, (a) whether the proper parties plaintiff are before the court (see footnote 1, supra), (b) whether a medical insurance crisis existed when La. R.S. 9:5628 was enacted (and when the statute was later substantively amended), and (c) if Mrs. Russo’s disease is one of the nineteen diseases cited in Whitnell, supra, or should be added to the list.

REVERSED; REMANDED.

BONIN, J., Concurs with Reasons.

. The record on appeal does not indicate whether the succession representative or the heirs of Janice Russo have been properly substituted as parties plaintiff. See La. C.Cr.P. arts. 648, 801 et seq., and 821. We presume that has happened because this matter has proceeded to this stage — submitted to this court for decision.

. A low grade squamous intraepithelial lesion is a type of abnormal growth of squamous cells on the surface of the cervix. Squamous cells are flat, scale-like types of epithelial cells. Epithelial cells are cells that help absorb, move, and distribute some of the fluids and nutrients in the body. The cervix is a small, cylinder-shaped organ that forms the lower part and neck of the uterus. Having a low grade squamous intraepithelial lesion does not mean that cancer is present. Cancer is an abnormal growth of new tissue characterized by uncontrolled growth of abnormally structured cells that have a more primitive form. The presence of low grade squamous intraepithelial lesions represents changes in cells that may occur before cancer is present. Thus, low grade squamous intraepithelial lesions are sometimes seen by doctors as warnings that cancer of the cervix may occur at a later date. See http://www.medfriendly.eom/l owgradesquamousintraepitheliallesion.html

.Cervical dysplasia is a common condition that describes abnormal precancerous changes to the cervix. Abnormal changes can range from mild to severe and are detected through a routine PAP smear. Although untreated cervical dysplasia may lead to cervical cancer in some cases, having cervical dyspla-sia does not mean a person has cancer or will even develop the disease. See http://cervical *944 cancer.about.com/od/ceivicaldysplasia/a/ dysplasia.htm

. See Sibley v. Board of Supervisors of Louisiana State University, 477 So.2d 1094 (La.1985). A Sibley hearing gives the parties an opportunity to present evidence regarding the constitutionality of a medical malpractice statute.

. The defendants/appellees rely on State v. Baxley, 94-2982 (La.5/22/95), 656 So.2d 973, which examined, inter alia, the constitutionality of La. R.S. 14:89 A(l), crime against nature. The court found the statute facially neutral and then addressed the issue of whether the statute was enacted because of a discriminatory purpose. The Court determined that the statute did not punish one class of persons more than any other class of persons and, thus, was constitutional. This, however is not the test when addressing the constitutionality of a part of the Medical Malpractice Act and a challenge that the statute in question discriminates on the basis of physical condition. See Sibley, supra.

. See also Whitnell v. Silverman, 95-0112, p. 4 (La.12/6/95), 686 So.2d 23, 26, wherein the Court stated:
On writ of review, we granted in part and denied in part. Although we agreed that the trial court correctly concluded that the doctor did not prevent the timely filing of plaintiffs’ action intentionally, fraudulently, or by ill practice, we remanded the case to the trial court for an evidentiary hearing and ruling on whether La. R.S. 9:5628 is unconstitutional. Pursuant to this Court’s order, the trial court conducted a Sibley hearing on the constitutionality of La. R.S. 9:5628, and concluded that the statute, as applied to plaintiffs, was constitutional. [Emphasis supplied; footnote omitted.]

. The plaintiffs/appellants have made no claim of sexual discrimination because only women may contract the disease of which Mrs. Russo died.

. This court found the best explanation was given by actuary Robert E. Lowe.
Perhaps the best explanation is given by actuary Robert E. Lowe. Initially Mr. Lowe noted that the insurance industry is exempt from antitrust laws. Mr. Lowe testified that the insurance industry undergoes regular 10 year cycles which include a "crisis” every ten years. We have had insurance crises in 1975, 1985, and are due one in 1995. These cycles are well known in the literature and have been discussed by academic writers and industry analysts for decades. The cycles are caused by underpricing by the industry itself. In order to compete for the premium dollar while still maintaining market share, insurance companies will underprice premiums for a period of time. Because they are all competing with each other for the same premium dollar and market share, they will all under-price at the same time. Mismanagement of pricing by the companies themselves creates a depletion of surplus, of loss reserves, such that pricing must increase over a short period to make up for the reserve depletion. As the pricing increases, it places strain on the insurance companies to absorb business. There is a relationship between the amount of business a company can write and the size of its surplus. When the surplus is depleted, its capacity to write new business decreases drastically. In order to add increasing prices in a short period of time at a rapid rate, the insurance companies must dispose of some business. Which business they dispose of is entirely within their control and entirely arbitrary, but the companies dispose of the business which they perceive to be more troublesome, such as medical malpractice and environmental. This disposal of business is a commonly recognized phenomenon in the insurance business and has been written about by many industry commentators. The insurance companies dispose or dump certain kinds of business by simply refusing to write certain lines. One such example is pollution insurance: it is impossible to buy pollution insurance today because companies refuse to write it. Id. at p. 7, 646 So.2d at 994.
[[Image here]]
Mr. Lowe also testified that in 1975 and prior thereto, medical malpractice insurance statistics were not separately compiled or required to be separately reported to the Insurance Commissioner’s Office. Thus there was no Louisiana medical malpractice information available at the time that the statute was passed. Mr. Lowe also noted that the Louisiana Insurance Commissioner’s Reports from 1965 to 1970 did not include the insurance companies' investment income. Id. at p. 8, 646 So.2d at 994.

. As noted in Walker, see Jeter v. Shamblin, 34,225 (La.App. 2 Cir. 12/6/00), 774 So.2d 1071; Martini v. Louisiana State University Medical Center-Shreveport, 28,167 (La.App. 2 Cir. 1/22/97), 688 So.2d 642; In re Medical Review Panel of Conerly, 02-0485 (La.App. 5 Cir. 12/30/03), 865 So.2d 198; Hardy v. Blood Systems, Inc., 01-0134 (La.App. 3 Cir. 5/2/01), 794 So.2d 13; Trahan v. Our Lady of Lourdes Regional Medical Center, Inc., 00-1140 (La.App. 3 Cir. 1/31/01), 778 So.2d 1205; Neal v. Pendleton Memorial Methodist Hospital, 99-0040 (La.App. 4 Cir.4/21/99), 733 So.2d 698; In re Medical Review Panel of Brown, 97-2803 (La.App. 4 Cir. 7/1/98), 715 So.2d 1249; Doe v. Southern Baptist Hospital, 98-0063 (La.App. 4 Cir. 5/6/98), 717 So.2d 654. But see In re Matter of Trahan, 03-1002 (La.App. 5 Cir. 1/27/04), 866 So.2d 907, a case involving a claimant with a disease with a latency period in excess of three years, in which the Fifth Circuit, finding that the constitutional ques *950 tion was not properly before it for review, set aside the judgment sustaining the defendant's exception of prescription and remanded the matter to the trial court to allow the plaintiff an opportunity to properly litigate the constitutional challenge.

. The Court stated:
Bossier Medical Center and the State of Louisiana seek review of a judgment of the court of appeal which declares La. R.S. 9:5628 unconstitutional. Pretermitting the merits, we observe that the court of appeal’s opinion in the present case appears to be in conflict with Williams v. Jackson Parish Hospital, 33,847 (La.App. 2 Cir. 10/20/00), 768 So.2d 866, reversed on other grounds, 00-3170 (La.10/16/01), 798 So.2d 921, in which a different panel of that circuit found La. R.S. 9:5628 to be constitutional. The majority opinion in the case at bar does not distinguish Williams, nor does it overrule that decision.
In light of this apparent conflict within the circuit, we find it appropriate to vacate the judgment of the court of appeal and remand the case for an en banc hearing. See, e.g., Lamson Petroleum v. Hallwood Petroleum, 02-1338 (La.10/25/02), 832 So.2d 975.

Id.

. In David, the plaintiff contracted Hepatitis C from a blood transfusion following surgery at Our Lady of the Lake Hospital. Hepatitis C is recognized as a disease with a latency period in excess of three years.

. The trial court may, in its discretion, bifurcate the trial of this issue from the remainder of the Sibley hearing issues as discussed in this opinion below.